260 So.2d 814 (1972)
The METALOCK CORPORATION
v.
METAL-LOCKING OF LOUISIANA, INC.
No. 4603.
Court of Appeal of Louisiana, Fourth Circuit.
March 21, 1972.
Rehearing Denied May 2, 1972.
Writ Granted June 15, 1972.
*815 Wray, Simmons & Robinson, Bert K. Robinson, Baton Rouge, for plaintiff-appellant.
Joseph V. Ferguson, II, New Orleans, for defendant-appellee.
Before REGAN, CHASEZ and BOUTALL, JJ.
BOUTALL, Judge.
This is a suit by The Metalock Corporation, located in Baton Rouge, Louisiana, against another corporation named Metal-Locking of Louisiana, Inc., located in Westwego, Louisiana. The suit seeks to enjoin Metal-Locking of Louisiana, Inc. from use of the trademark "Metalock", and from use of a trade name similar to that of the Metalock Corporation and to enjoin the defendant corporation from certain specific acts of deceptive advertising, false claims, and other acts which tend to establish unfair trade practices. Additionally, the plaintiff seeks damages in the sum of $25,000.00. To this action, the defendant corporation has reconvened seeking similar relief on its behalf. The trial court dismissed both plaintiff's suit and defendant's reconventional demand, overruling a number of exceptions filed in the case, and ordered each party to bear its own costs.
From this judgment the plaintiff has appealed, and the defendant has answered the appeal, contending that the trial court erred in overruling its exceptions and dismissing its reconventional demand, and in ordering it to bear its own costs.
In brief outline, the case may be stated as follows:
Plaintiff-appellant, The Metalock Corporation, located in Baton Rouge, Louisiana, was incorporated in Louisiana on July 30, 1964. Defendant-appellee, Metal-Locking of Louisiana, Inc., now located in Westwego, Louisiana was incorporated in Louisiana on March 12, 1959. Both of these businesses are alleged to be continuations of other businesses conducted prior thereto under different names and ownership, each using the name "Metalock" and the particular process to which that name applies, that is, the repairing of cracks in metal castings by use of certain patented metal tins. As each of the parties expanded its business over the passage of time, they *816 came more and more into conflict with each other, resulting in a demand on June 26, 1967 by plaintiff-appellants that the defendant-appellee cease using the name "Metalock" or "Metal-Locking". Shortly thereafter this suit was filed.
In a painstaking and well reasoned judgment, the trial court decided that the determinative issue before the court was this: Has either plaintiff or defendant established, by proper proof, its exclusive right to the use of the term "Metalock" in the State of Louisiana as a result of prior appropriation by use? After an examination of the voluminous testimony, interrogatories and depositions offered by both parties, as well as the numerous exhibits introduced, the court concluded that neither party had established exclusive rights to the use of the term. In reaching this conclusion, the trial judge examined each contention raised before him and made specific findings of fact, which led him inevitably to the judgment that he rendered. A similar careful consideration of the record, as urged upon us strenuously by appellant, convinces us that the findings of the trial court are correct and should be affirmed.
It may be well at this point to make a statement of facts, as shown by the record to aid in an understanding of the decision herein.
The matter begins with the activities of a certain L. B. Scott of San Antonio, Texas (not a party to this suit) who applied for and was issued letters patent for a process of cold repairs to castings, forgings, etc., which he called "Metalock". In addition to obtaining letters patent, Scott also filed with the patent office a registration statement and obtained a registration of a trademark, "Metalock", on May 3, 1938, renewing it for twenty (20) years from May 3, 1958. The patented process consisted of drilling a series of holes in the vicinity of the crack and then driving small pieces of metal called keys into the areas where holes had been drilled, and in this manner pulling the cracked metal back together and adding additional strength to the area repaired. A reference to the trademark registered by Scott discloses that it consisted of the word "Metalock" written in a straight line and that the edges of the letters were scalloped, so to speak, to disclose the configuration of the keys which were used in his patented process.
Scott commenced operations in the early 1930's in various states using the business name, Metalock Casting Repair. These offices which Scott opened or the franchises which he granted related both to the use of his patented system and to the use of the registered trademark and often the name Metalock Casting Repairs.
Operations by Scott in Louisiana commenced sometime prior to 1939 when he was operating in Louisiana through an agent, one Ben Gilbert of Shreveport, Louisiana. Gilbert operated under Scott's name, Metalock Casting Repair. During the year 1939 Gilbert, on behalf of Scott, entered into an agreement with one Fred C. Williams of Crowley, Louisiana, under the provisions of which Williams was permitted to operate in a portion of Louisiana and to pay Scott a royalty.[1]
*817 It is evident that Williams commenced operation under this contract; however, the record is quite scanty and sparse with respect to the nature and extent of Williams' operation. Quite obviously, in the latter years of Williams' operation, such business as he may have conducted was on a reduced basis, so much so that one of his brothers-in-law, Joseph Philip Smith, testified in his deposition, that toward the end his casting repair business was more or less as a hobby, inasmuch as Williams had other sources of income.
The testimony, both in the depositions and on the evidence adduced at the trial, indicated that Williams had no place of business in Crowley established as his own. Williams worked on the road and when necessary to his work he used a machine shop owned by a friend who also helped in some repairs. He had no signs indicating the identity of his business and used a garage at his house to store material.
At some point in time, probably during the year 1947 or earlier, and while the Williams agreement was presumably in force and effect, L. B. Scott employed or sent agents, representatives, etc., into Louisiana to solicit business for the repair of broken castings, etc., using the name of Metalock Casting Repair Service, which many of his employees called "Metalock of Houston". There is no evidence in the record or otherwise which indicates that Williams made any objection to Scott's operations in Louisiana. In fact the evidence shows that Williams preferred to work on a small scale and it was expected that the parent company would handle jobs in Louisiana also.
In the early 1950's and as the result of litigation between Scott and a man named Harman, Scott was enjoined from using his repair process on the grounds of patent infringement. Harman caused copies of his injunction to be served upon many of Scott's representatives, including Williams, and thereafter Williams declined to pay royalty to Scott, but nonetheless continued to conduct such operations as he did under the name Metalock Casting Repair, with his name printed underneath it as District Representative. The material Williams used in the brochures which he had printed and distributed under this name, as well as all of the photographs, etc., and literature, were obtained from L. B. Scott.
During the early part of 1958, two former employers of L. B. Scott's Houston, office, A. B. Carr and Gilford Carter, opened a casting repair business in Harvey, Louisiana, in which they used the word Metalock to describe the type of repairs they performed. In December of 1958, another former employee of Scott, M. C. Borey, joined Carr and Carter in their Louisiana operation. This business was owned by Carr with Carter and Borey operating the Harvey office from which they solicited business, performed repairs, etc., under the name of Casting Repair Company. At all times they referred to the process of repairs which they used as Metalock or Metal-Locking.
Some time during 1957, Chester Harris, another former employee of Scott, moved to Louisiana and entered into a contract agreement[2] with Fred C. Williams under the provisions of which Harris was to be entitled to use the name and good will of *818 Williams in soliciting business in Louisiana and agreed to pay Williams ten (10%) percent on any of the business which Harris was able to obtain.
Harris worked out of Crowley with Williams for more than a year and then moved to Baton Rouge where he commenced to conduct a business from his garage. Brochures were printed using the name Metalock Casting Repair Service and underneath that name, the names of F. C. Williams and Chester Harris, District Representatives. In 1960 or 1961 he took his son, Cleon Harris, into the business and continued to operate using the same name. In 1964, Harris and his son incorporated under the name of The Metalock Corporation.
Some difficulty in the use of the corporate name was experienced because it was discovered that a certain A. D. Lasater, who operated a casting repair service in Arkansas, had registered with the Louisiana Secretary of State, a trademark, "METAL 0=0=0=0 LOCK", on July 13, 1959, and that Lasater's corporate name was quite similar. By virtue of a document entitled "Sale and Assignment of Trade Name and Trade Mark" dated May 2, 1967, The Metalock Corporation acquired Lasater's trademark and trade name, described as "Metalock" and "Metal-Lock".
It is clear from the record that the principals in the corporate entities party to this suit knew in general that their counterparts and others were in existence and engaged in the same type of business in Louisiana. There were only two or three isolated instances prior to 1966 where the parties had come into conflict. From 1966 on, there is an increase in these instances, obviously because of the expanding nature of their businesses. In the period 1959-1960, plaintiff (including predecessors) has increased in gross sales from an estimated $12,000.00 annually to an estimated $400,000.00. In this same period, defendant increased in gross sales from $31,000.00 to $249,000.00.
We shall now turn our attention to a consideration of the issues of law involved.
The main issue before us is basically two-fold. Plaintiff complains not only that defendant uses its patented word Metalock in its business operations and advertising, but also that the corporate names are so similar as to cause confusion and deception. One aspect is the application of the statutory law pertaining to trademarks set out in LSA-R.S. 51:211 et seq. As set out in the amendment by Act 235 of 1954, the definition of a trademark is as follows:
"§ 211. Definitions
A. The term `trade-mark' as used herein means any word, name, symbol, or device or any combination thereof adopted and used by a person to identify goods made or sold by him and to distinguish them from goods made or sold by others, or to designate a particular place of business."
These sections were amended and broadened by Act 475 of 1968 to include "trademarks", service marks, and trade names.
*819 The other aspect is the application of the statutory law pertaining to corporate names contained in L.R.S. 12:4 through the year 1968, (then amended and placed in LSA-R.S. 12:23 effective January 1, 1969) providing that the corporate name shall not be the same as, nor deceptively similar to, the name of any other corporation. Auxiliary to this are the provisions of LSA-R.S. 51:281 et seq. relating to the registration of assumed business names other than corporations and, in some instances, partnerships, but none of the corporate predecessors appear to have so registered.
Our jurisprudence has consistently held that the mere registry of a trademark is not decisive of the right to its use. The rights of the parties to use it are determined by the priority of appropriation by use. Gallo v. Safeway Brake Shops of Louisiana, Inc., 140 So.2d 912 (La.App. 4th Cir., 1962). The party establishing the prior appropriation by use is entitled to the exclusive use thereof. Handy v. Commander, 49 La.Ann. 1119, 22 So. 230 (1897); New Orleans Checker Cabs v. Mumphrey, 205 La. 1083, 18 So.2d 629 (1944); Paducah Distilleries Co. v. Crescent Mfg. Co., 6 Orleans App. 151 (1909); Credeur v. Jones, 46 So.2d 325 (La.App. 1st Cir., 1950). Trade names are granted the same protection as trademarks, New Orleans Checker Cabs v. Mumphrey, supra.
Focusing our attention on the registry of the corporate names, we note that plaintiff, The Metalock Corporation, was registered in 1964 and defendant, Metal-Locking of Louisiana, Inc., was registered in March 1959. Lasater registered his trademark Metal-Lock in July, 1959. Thus, if this were a simple question of priority of registration, it is obvious that defendant would prevail and its reconventional demand for exclusive use be granted.
However, the matter is not that simple. The individuals who founded these corporations had engaged in this same type of operation, the metalock process, for some time in various capacities under different trade names. As remarked by the trial judge:
"The voluminous testimony, interrogatories and depositions offered by both parties as well as the numerous exhibits were considered by the Court in reaching its conclusion. The passage of time, the death of persons with personal knowledge of the facts as well as the self-interest of various witnesses have not contributed to a simple resolution of the issues.
The Court finds as factually established the following: The trademark or trade name "metalock" was first used in the State of Louisiana by L. B. Scott, either directly from its Texas office or through representatives in this state or both. This first use of "metalock" included the use of other terms describing the process of cold metal repair, i. e., metalace, masterlock and other similar names. The Court further finds that no grant, sale, license, transfer, etc., was made to either plaintiff or defendant by the original user of the mark, L. B. Scott d/b/a Metalock Casting Repair Service of Houston, Texas."
The record clearly shows not only that Scott's company was doing business in Louisiana using the word metalock long prior to the parties' predecessors doing business but also that it actually employed them all at one time or another and continued doing business in Louisiana (and in fact more business for some time) during and after the establishment of the predecessor businesses. Thus, at the time that Carter and Borey or Harris began doing business in Louisiana neither could properly claim exclusive use of metalock.
The major area of concern in this regard is the claim that Harris purchased the business of F. C. Williams and thus derives the right of appropriation by use through him. (Plaintiff also claims rights through Lasater, but it is clear that he did no business in Louisiana except one or two isolated jobs.) Reference is had to the *820 document entitled "Working Agreement" set out in full hereinabove. It is clear that Williams started out not on his own but under a sort of franchise paying royalties to Scott and using Scott's trademark and advertising brochures in this business.
Williams stopped the royalty payments to Scott when served with a copy of the Harman injunction (which seemed to be based on the use of the repair process, not use of the word Metalock), and this would have the effect of cancelling the agreement which was "good as long as live [sic] up to by both parties". Scott never attempted to oust Williams from his territory, however, and we can only speculate as to the reason why, although the testimony of Mr. Finch indicates that it was friendship. Nevertheless, the two seemed still to observe the rest of the agreement and to have engaged in some mutual projects. (It may be observed that both Scott and Williams were deceased at time of trial.)
In any event it is obvious that Williams did not consider the use of Metalock to be his property and still felt he was restricted to the territory stated in the Scott agreement. We refer to the "Contract Agreement" between Williams and Chester Harris and note that Harris is employed "as agent in the territory claimed by said F. C. Williams". Harris contends that this document represents a sale of Williams' business to him for ten (10%) percent of the gross sales for some indeterminate period, apparently concluded November 19, 1965, by a receipt of payment.
By no stretch of the imagination can that document be termed a sale. Its plain terms show it otherwise. Equally important, it is significant that while Harris is to act as agent in the territory for use of the Metalock Repair Method, the ten (10%) percent is paid for the use of the name and good will of Williams. Nothing is said of the name or good will of Metalock.
The evidence shows despite the testimony of Harris as to sale, that Williams still continued to do jobs for some time thereafter, that Williams kept the books and records in Crowley, although Harris was in Baton Rouge, and that the company name and advertisements were not changed from "Metalock Casting Repair Service, F. C. Williams, Representative", except to add "Chester Harris, Representative."
Plaintiff urges to us the consideration of an affidavit of F. C. Williams dated November 3, 1966, to explain the relationship between Williams and Harris. This document was not introduced into evidence nor even offered for introduction. It was referred to in a deposition of Cleon Harris but not attached to the original deposition or the copy afforded opposing counsel. The deposition of Cleon Harris was placed in evidence but there is not even an offer of the affidavit in the deposition. Counsel contends that there was a copy attached to the copy of the deposition he obtained and he thought, therefore, that the affidavit was filed in evidence. He was aware of this situation because it arose during a prior trial on exceptions. He asks us to consider it in evidence or remand so he can offer it to the trial court. Opposing counsel informs us that he would have strenuously objected had the affidavit been offered in evidence and does so now.
The document is clearly not in evidence either before us or the trial court and we see no reason to remand for the purpose of attempting its introduction. Even though counsel mentioned its possible introduction in his pretrial memorandum, he made no effort to do so. The record shows he was granted time to consider if he had introduced all of his documentary evidence and obviously carefully considered that he had.
In any event, the affidavit could not have been successfully introduced into evidence. It was not taken in accordance with any rules relating to discovery or preservation of testimony, but is simply unilaterally obtained without notice to anyone and so prevents the opponent from cross-examination of the witness. This is even more important when we consider the *821 evidence shows that Williams was confined due to some infirmities around this period and is now deceased. It further violates the evidentiary rules relative to hearsay in that it was made long after all of the events enumerated took place.
We conclude, therefore, that there was no sale or assignment from Williams to Harris invoking the exclusive use of Metalock, nor could there have been. Not only did Williams have no authority from Scott to make such a transfer as to the patented word Metalock, but the process has lost its patentability and uniqueness and is available for anyone who wishes to use it.
The trial judge found as follows:
"With regard to the word `metalock', the Court finds that it is descriptive of a service rather than a commodity or article of commerce. Additionally, the Court finds that the term is simply descriptive of a method of repair used on metal. Both parties agree that anyone is at liberty to perform the repair service so described."
The testimony of the principals themselves, as well as that of Finch, amply substantiates this finding. LSA-R.S. 51:212(5) provided that a trademark shall not be registered if it consists of a mark which is merely descriptive. The present 51:212(5) is to the same effect. DryIce Corporation of America v. Louisiana Dry Ice Corp., 54 F.2d 822 (USCA 5th Cir., 1932), writ denied, 286 U.S. 558, 52 S.Ct. 640, 76 L.Ed. 1291; Home Beverage Service v. Baas, 210 La. 873, 28 So.2d 481 (1946); White v. White, 68 So.2d 648 (La.App. 1st. Cir., 1953). In Tefas v. Gatzoulas, 17 La.App. 276, 135 So. 693 (La. App.2nd Cir., 1931), the opposing parties operated lunch stands both under the name "Coney Long Island 5¢ Stand," selling "Coney Island Hot Dogs". There, "Coney Island" was held to be a generic name descriptive of a type of food, and that "such stands are commonly referred to as `Coney Island Stands'". A name being merely descriptive of a business operation, and of a class of food, could not be appropriated as a trade name.
Thus, we conclude that neither party is clearly entitled to the exclusive use of the metalock or metal-locking process of casting repair or the words themselves based upon prior appropriation by use, and we now pass to a consideration of the acts of confusion and unfair trade practices.
As remarked previously there were only a couple of incidents of confusion prior to 1966. The reasons are quite obvious. Each company was relatively small and operated to large degree in different areas. Perhaps more important was the fact that the names were quite distinguishable at firstMetalock Casting Repair Service compared to Metal-Locking of Louisiana, Inc. When the former changed its name to The Metalock Corporation in 1964, the original dissimilarity was lessened and the chances of confusion increased. In this facet of the evidence the actions of plaintiff would seem to be the cause of the confusion and this is the basis of plaintiff-in-reconvention's claim. Former L.R.S. 12:4.
On the other hand plaintiff alleges some specific actions of defendant about which it complains. The only fact that is certain is that the customer thought he was dealing with another company. The disinterested witnesses do not testify of first hand knowledge that Metal-Locking of Harvey did in fact represent itself as Metalock of Baton Rouge or that it took business deliberately knowing it to be that of the other. That evidence comes from the employees of Metalock. In most of the incidents the confusions seemed to have arisen simply out of the similarity of names.
We therefore conclude, as did the trial judge, that neither party has borne the burden of proof in this regard.
With the facts that we have before us, and considering that metalock and metallocking are descriptive names of a process *822 of metal casting repair we entertain some doubt as to the desirability of the registration of these corporate trade names. However, the trial judge found, and we concur, that both corporations have flourished and built a considerable business under their respective names. Certainly, each should be permitted to continue the use of its corporate name, there being no unfair competition or fraudulent or deceptive practices proven, and thus to reap the economic advantages of the good will and business each has created. As the trial judge remarked:
"The Court is impressed further in this regard with the evidence which establishes that both plaintiff and defendant corporations have grown from rather modest beginnings in their formative years to successful business entities enjoying substantial gross business. The Court is of the opinion that neither corporation has been harmed in their competitive positions and that competition, where not unfair, or subject to other legal objection is both desirable and in the best interests of our economic system."
There remains only a few incidental issues to be resolved. Since we find no right of exclusive use of metalock or metal-locking in either party and no unfair trade practices, we are not called upon to discuss the demands of each for damages or for an accounting, nor can we grant the injunctive relief sought by each.
Metal-Locking of Louisiana, Inc., in its answer to the appeal, seeks our consideration of its exceptions. We believe that they are largely answered in our discussion of the merits of the case. The evidence shows there is no merit to the pleas of prescription and estoppel by laches. L. B. Scott is certainly not an indispensible party to the adjudication of the rights between these two parties. Whatever rights he or his successors may have are subject to assertion in another suit. As for the exception of no right or cause of action, the various pleadings clearly assert both a right and a cause of action. Since the case proceeded to a full trial on the merits, we prefer to base the judgment on the merits, not the exception, and therefore the exceptions are overruled.
Metal-Locking also complains of the ruling that each party shall bear its own costs. The trial court may assess costs in whatever manner appears equitable. LSA-C.C.P. 1920. We find no error in the trial court's assessment of costs. We do, however, assess the costs of this appeal against appellant, The Metalock Corporation.
For the foregoing reasons, the judgment of the trial court is affirmed.
Affirmed.
NOTES
[1] "Crowley, Louisiana

April 11, 1939
WORKING AGREEMENT
Between J. B. Gilbert representative of Metalock Company and Fred C. Williams, I, J. B. Gilbert am to train Fred C. Williams to do Metalock, repair for the sum of One Hundred Fifty Dollars ($150.00) to be paid as agreed upon and Fred C. Williams is to work in territory in South Louisiana and be allowed what territory that he can work properly. This territory must be thoroughly and efficiently worked and it is further understood that he may have territory enough to keep him occupied. After receiving his training he is to make weekly reports on work done by him. He also is to pay a 25% royalty on all work done by him direct to Mr. L. B. Scott, 115 Beal Street, San Antonio, Texas. He also is to purchase his material from Mr. Scott at $2.00 per pound and use no other material than furnished by Mr. Scott to do Metalock repairs with. It is understood that royalty must be paid upon receiving payment for work and if there are adjustments to be made, Fred C. Williams is to do that at his own expense. He is also to use his own judgment in regards to setting his prices. This agreement is good as long as live [sic] up to by both parties.
 Signed /s/ J. B. Gilbert
 Signed /s/ Fred C. Williams"

[2] "Mechanical Engineer
 Metalock Repair
 Service
 CONTRACT AGREEMENT
 F.C. Williams
 P.O. Box 134
 Phone 879
 Crowley, La.

This agreement between F. C. Williams and Chester Harris, entered into this 13th day of June 1957, covering the employment of said Chester Harris as AGENT in the territory claimed by said F. C. Williams, for the use of the Metalock Repair Method, in the repair of cracked and broken castings in which Chester Harris agrees to pay to F. C. Williams ten percent of the gross earnings revenue that he may earn in this said territory for the use of the name and good will of said F. C. Williams in this said territory. This territory covers and includes the South portion of Louisiana, below a line running East and West through the town of Alexandria, La.
Signed this 13th day of June 1957 by
Fred C. Williams
Signed this 13th day of June 1957 by
Chester Harris
Supplement:Chester Harris agrees to report to F. C. Williams on the tenth of each month on the gross earnings of the Metalock repairs done by him. And also agrees to have his records open for inspection by F. C. Williams.
 /s/ Fred C. Williams
 /s/ C. Harris